We have two cases to hear this morning, somewhat varied in subject matter, but both important cases. The first one we have on our docket is Hess Corporation v. Schlumberger. And we'll hear from Mr. Shaw, Ms. Shaw. Thank you. Thank you, Your Honors. May I remove my mask? Please take off your mask. Thank you. May it please the Court, Maren Shaw from Quinn Emanuel, Urquhart & Sullivan, on behalf of Appellant Hess Corporation. This is truly the rare case where the district court's judgment following a bench trial should be reversed, because the district court ignored clear contract terms, turned Texas law of causation on its head, and ignored the overwhelming contemporaneous evidence and internal investigative findings in favor of Schlumberger's mere say-so at trial, all in service of rendering judgment in favor of Schlumberger, where neither the contract nor the law nor the facts support this result. And this Court has not hesitated in the past to reverse in circumstances just like this, where the district court's judgment following a bench trial was premised on a fundamental misinterpretation of the contracted issue, or where this Court has been left with the firm conviction, based on the entirety of the record, that a mistake has been committed in terms of the causation factual findings. Now, I'd point your honors, we cited several cases in our briefs, including the Kahn Credit case, WBMCT, Lohr Brothers, and three expos, among others. And reversal is equally warranted here as in those cases. And it's necessary to preserve the integrity of the contract standards at issue here that the district court got wrong, which are important not only to Hess's contract, but affect countless oil and gas contracts across this industry that rely on those same standards. And reversal is necessary to return clarity to the otherwise clear landscape of Texas causation law. I'd like to start by addressing the district court's misinterpretation of the contracted issue. The district court's fundamental legal error here, which this Court reviews de novo, was ignoring the significance of the word of in the American petroleum industry standards incorporated into the party's contract. Counsel, we've read your briefs, and you can certainly elaborate on it here. It does seem to me that what the district judge did is he looked at contract terms, but he also listened to testimony. There were interested experts, but nonetheless, there was testimony about the industry approach to interpreting this. So, I mean, go over the wording if you want to, but isn't that what we're dealing with, an interpretation based on what was said to be the way this is interpreted in the industry? And it's at least one plausible, to me, reading of the language. Your Honor, I appreciate that question because I think it's important. And here, Texas law is clear that where a contract is unambiguous on its face, extrinsic evidence like expert testimony and industry experts aren't appropriate in interpreting the contract. Now, there was testimony from experts at trial in terms of how to interpret this and other provisions of the API, but what we're talking about here is a clear, unambiguous word, and the district court correctly found below that the contracted issue here was unambiguous and that undefined terms should be interpreted according to their plain, ordinary meaning. And he was right in saying that. And the word we're talking about here is the word of. Now, this isn't a term of art that requires expert testimony to interpret. It's a plain, ordinary term that needs to be interpreted according to its plain, ordinary meaning. And if I could go right to the standard at issue here, 6.3.2.2 of the API references the validation testing that is integral and fundamental to this standard and to the API's function. And it requires that safety valve equipment, quote, shall be manufactured to drawings and specifications that are substantially the same as those of the size, type, and model equipment that has passed the validation test. And the word of does real work in this clause. It's not just a throwaway. Because it's important to safeguard the very purpose of this standard, which is to ensure that later manufactured valves would pass the validation test the same as the original validated valve without needing to retest every valve individually. And that's why this standard uses different words when it comes to different relational aspects of the things at issue here. And what I mean by that is this. The standard does use a substantiality requirement when it comes to a different relationship. And there we're talking about the relationship between later drawings and the original drawings. And the drafters made clear in that respect that later drawings must only be substantially the same as the original drawings. So a later valve needs to be manufactured to a drawing that is substantially the same as the original drawing, meaning it doesn't need to be exact, but it can be basically the same. But the original drawing needs to be of the validated valve. My understanding of the record in this case is that there is no drawing necessarily of the valve as tested. That's correct. And so you're focusing on the word of. It seems to me we're focused on how this should focus on how potentially this should apply to a situation like that. Are you saying this is automatically, I don't know if you would say met or not met depending on how you come at it, that the result follows automatically because there's no drawing? Yes, Your Honor, and for a number of reasons. Number one, that's what the plain language of this standard requires, because the plain language requires, A, a drawing of the validated valve, and, B, that later valves be manufactured to drawings that are substantially similar to the drawing of the validated valve. Those are two requirements. But also I think it's noteworthy that even though I said expert testimony here isn't necessary, Schlumberger's experts at trial, their API experts, didn't disagree with this interpretation. They agreed that where there is no drawing of the validated valve, where there's a drawing that doesn't match the validated valve, that violates this section of the API. Schlumberger's own experts agreed with that interpretation, and that's dispositive here, yes, Your Honor. I do think it flows automatically from that result, because if there is no drawing of the validated valve, then it can't comply with this section of the API. Let's try to face the reality of the fact that the valves operated by Hess failed 100%, whereas the other valves by other companies failed 40% at the most. So how do you explain or blame Schlumberger for the failure of your valves? I'm glad Your Honor raised that, because I think it's also important here, and that's not quite right. It's kind of a trickery of words when you look at those statistics, because the real statistics show when Schlumberger says that Hess's valves failed 100% of the time, they're talking about Hess's operating of Schlumberger valves. Now, the evidence also showed that all of the— The only thing they could talk about is their own valves. Well, respectfully, no, Your Honor. I mean, when you look—the evidence showed that when you look at all of the other wells that Hess operated in the Gulf of Mexico using valves manufactured by anyone other than Schlumberger, the failure rate was zero. So when Hess uses any other manufacturer's valves in all of those wells, nothing fails. When Hess uses Schlumberger's valves, they fail. And I think the flip side of that statistic, Your Honor, is the Schlumberger valves themselves, because the Schlumberger valves— Schlumberger also makes a big deal about how the failure rate of the valves, the Schlumberger valves among other operators, was low, and that's also not quite correct. It's a little bit of trickery with statistics, because to get to a low failure rate for Schlumberger valves and other operators, Schlumberger, number one, expanded the sample set to include other valves than the valve that failed, other kinds of valves, and, B, ignored failures where only one seal in a valve failed and didn't cause entire valve failure. So they ignored known failures and expanded the sample set to get to a low failure rate with other operators. When you look at only the valves at issue here, the valves that had this problem, and you include every known failure of a seal in those valves, the failure rate for Schlumberger valves is 40%. It's 40%. For Hess use or for other use? Including Hess and everyone else. If you exclude Hess and look only at other operators, it's 26%. Is that in your brief? Yes, it is, Your Honor. And it's in the record below. So this statistic has been widely cited, but it's not correct, and I think that really exemplifies the issue here. Schlumberger is not right when it says that Hess's operations caused the valve failures because Hess operated other valves made by other manufacturers in its wells across the Gulf. None of those failed. When Hess operated Schlumberger valves, they failed, and when other operators operated these same Schlumberger valves, they also failed with a rate of 26% failure rate excluding Hess's failures. And this is important, Your Honor, because, again, you know, I touched on the contract misinterpretation, and we go through the contract interpretation both of 6322 and 762 in our brief. But I want to also touch on something that Your Honor's question raises, which is the evidence on causation here. Now, the district court turned the causation standard on its head when it looked only at whether Hess's operation of the wells caused the valve failures without also looking at whether Schlumberger's breach of this contract in supplying faulty valves was a but-for cause of the valve failures. Now, Texas law is clear on this. Texas law employs a substantial factor or producing cause test for causation for contract damages, which does hold a breaching party liable for the entirety of the damage if the breach was a substantial factor in producing the damage, even if there was contributory cause from the plaintiff. Counsel, as I read the district court's findings and conclusions, this entire section that you cite us to which is talking about what you're now talking about, but preceding that was a discussion of other possible causes, and the district judge rejected those. Now, I don't see in there whether the district judge ever articulated the specific standard that he was applying, but it does seem to me that he looked at causation of other sorts, including what you were claiming, and rejected them. Is that not the proper reading? I'm sure it's not, of your opinion. I'm not going to tell Your Honor that you didn't make the proper reading of the district court's. You say it's blatantly wrong, but what's wrong with it? Well, what's wrong with it is I think the district court's decision on causation indelibly flowed from its mistake on the contract interpretation. You can see that when you read the decision as a whole, which is it had already decided, based on an erroneous interpretation of the contract, that there was no breach here. And so when you look at its causation analysis, it's obvious that it focuses only on what was wrong, in its opinion, with Hess's operations, and it doesn't even consider whether a faulty valve was a cause of the breach. And it's not that it was weighing the evidence and applying the right standard. I think the error flowed through from the fundamental contract misinterpretation into the causation analysis, and it didn't actually consider and reject whether Schlumberger's breach of the contract in supplying a faulty valve was another but-for cause. It did not consider that. But your rebuttal to the factual argument that the spring doesn't matter once you have this valve deep into the sea. Yes. Thank you, Your Honor. I do think that's important as well, because the district court's judgment and Schlumberger's argument at trial was all premised on this idea that a faulty spring, even if broken, doesn't matter when you install it downhole because it won't affect the seal. And you don't have to believe the evidence at trial or my say-so about this because Schlumberger, in real time, during its internal investigation, knew and wrote that that wasn't the case. Now, Schlumberger's internal engineer, Dwayne May, who testified as an expert in trial, wrote during the internal investigation that the faulty spring in the valve, which it called the smoking gun and root cause of these failures, could manifest problems downhole. I would like to emphasize that, if I were you, but isn't that just other evidence that gets weighed? I mean, it certainly is an awkward set of facts, to be polite about it, for Schlumberger. But nonetheless, they explained it. They came up with other explanations. All that was in front of the jury and the district court. Why is that any more conclusive than any other evidence? Because, Your Honor, as I said, this is the rare case, and I understand it's rare, but this isn't about a weighing of the evidence. The explanations that Schlumberger came up with at trial, when examined, just don't hold water. Now, when you take Your Honor's example of the downhole valve, and this spring supposedly doesn't manifest an issue downhole, there's nothing about that that would have required new evidence or new thinking between the time that Schlumberger said, oh, yes, these things can manifest an issue downhole, and recalled all of their springs worldwide. This isn't just a matter of something written in an internal document. Schlumberger's internal engineer accused another Schlumberger employee of whitewashing the data. That's his quote, whitewashing the data, when the other employee even suggested the explanation that the spring couldn't manifest an issue downhole. He said, you're whitewashing this data, yes it can, and then Schlumberger acted on it. They recalled all of their valves for all their other customers worldwide. And I think it is implausible to believe that Schlumberger would have done that if there was any possibility that it was Hess's operations of these valves and not an inherent defect that caused these valve failures. And I want to come back to this specific issue, and I know I'm short on time, but I do want to answer Your Honor's question, because Schlumberger gives various explanations. Please don't grab it yourself, but we'll allow you to go beyond the deadline. Thank you. I appreciate that. And I'm from New York. I'm trying not to talk too fast. But Schlumberger came in at trial, and the only thing it had to support it at trial were its paid employees and hired experts. And I know that's quite typical of trials, but the difference here is there is no explanation it gave on this issue of functioning downhole that it wouldn't have and didn't know at the time. There's nothing about Hess's operation of a spring that changes this equation. This has to do with the very physical properties of whether a spring does or doesn't make any difference downhole. That's a matter of physics. It either is or it isn't. Schlumberger's engineers knew it before and they knew it afterwards, and they didn't advance any credible explanation for why there was a 180-degree reversal on this point when there is no other evidence that could have been brought to bear that would have changed that opinion. And so for that reason, thank you, Your Honors. You can add a minute to the next time. Though you may be more concise than that, I don't know. Good morning, Your Honors, and may it please the Court. The district court's judgment here followed a 10-day trial with 11 live witnesses, and it rests on at least three independent findings of fact. To get any relief on appeal, Hess has to show that all three of those factual findings are clearly erroneous. They have to show that the district court was wrong to say that Schlumberger's manufacture of the valves conformed to industry standards when Hess presented API compliance experts— or, sorry, Schlumberger presented API compliance experts and Hess did not. They have to show that the district court clearly erred in finding that Hess failed to prove that the nonconformance or any nonconformance in the springs caused the wells to fail. And they also have to show that the district court was wrong to find that Hess's use of the valves for more than a year at thousands of feet of depth under the earth substantially changed their condition so that Hess could no longer revoke its initial acceptance of those valves. Hess hasn't provided any basis for finding clear error on any of these issues, much less all three of them. So again, this trial came down to a battle of the experts that included credibility determinations based on live testimony. And I'd like to start with the causation issue because I think that really highlights the importance of this disagreement among the experts that the district court resolved. The court found that the springs were not a substantial cause of the failure. It's simply incorrect to assert that the court only looked at Hess's operation. The court also looked at whether the springs themselves did or could cause the failure. Let me ask, did the district judge ever state what standard of causation he was applying? Did he cite case law? I'm trying to recall this fairly lengthy opinion. It seems to me we have to read some things into it. And I do read into it the possibility that he's applying the proper Texas causation law to this. But does he say in the opinion a standard? Your Honor, I can tell you. Look, I'm not sure based on the findings and conclusions. But what I can tell you is that if you go through his analysis, he simply doesn't do what Hess says that he does. He considers the role that the seals played. And, in fact, the best evidence, I think, showing that the springs were not a substantial cause, is that when Schlumberger gave Hess new seals, new seals that indisputably conform to API standards, those seals failed too. That defeats the idea that but for the spring design, the failure would not have occurred. The failure did occur, but without the spring design. So that's the best evidence. And, of course, the evidence also showed why the springs could not have contributed to the failure. The springs don't play a role once the seal is initiated and the valve is installed thousands of feet underground. And the expert testimony explained that. And it was uncontroverted on this point. Once a valve is installed at depth, the environmental pressure from the earth takes over and it vastly overpowers what any seal would accomplish by a factor of 100. Your friend on the other side alluded to this already. It's a nice touch at the beginning of her brief, talking about this is really a case, a battle of experts, both of them from Schlumberger. What Schlumberger first said was the problem and now what Schlumberger's trial says was the problem. Well, as rhetoric goes, that's pretty good. But that is a significant factual issue here. And as I responded earlier, it does seem to me it just goes into the mix. But it is hard for me to understand why this happened. As if Schlumberger just likes throwing around hundreds of millions of dollars to fix things, it's not their fault. You got any kind of brief answer to what is this all about? Well, you're obviously right that that was an awkward fact. Well, no, awkward is too general. But anyway, it's there. But here's the reality. There's no question that that analysis was admissible, and the court admitted it and considered it. But the court didn't ignore it. The court specifically found that it was wrong. And the evidence showed. It really does tell me that I have no doubt with the professional credentials of the people who testified. But it does make you worry about why they testified one way once and why experts were saying something different earlier. Well, you can move on from there. It's just part of the record. It is. And to be clear, the court did explore this. I mean, there was testimony at trial from people who were part of that process, including the authors of some of these e-mails from 2016. The author, Duane May, who was an expert and did further work after the 2016 analysis. That's part of what the record showed. That 2016 analysis was based on information available at the time, but it was also based on work done at the time. And the fact is additional work happened afterward. And the district court heard all of that, including testimony from Duane May, who testified that it turns out, upon reflection, that the 2016 analysis was wrong. The judge heard that testimony live and had the ability to weigh its credibility against the full weight of the evidence on both sides and concluded that he agreed that that analysis in 2016 was wrong. And that's a factual finding to which this court should refer. Is that what Schlumberger based their decision on, to recall the valves worldwide? Counsel for Hess referred to that. What we know from that is that Schlumberger really believed at the time and put money behind it that the valves did have a problem. Were the replacement valves the same? The replacement valves were not the same. Did they have the Rosetta Springs? I'm sorry? Did they have the Rosetta Springs? They did, but they had Rosetta Springs that were redesigned and that we all agree now conformed with API standards. I mean, we think the original ones did, too. But the fact is that when one of those redesigned springs and valves was provided to Hess in Well B-2, it failed, too. That valve failed, too. Because of the procedure. Because of the way that Hess was departing from the Schlumberger recommended pressure. This was a problem that was- What exactly was that? I'm sorry? What exactly was the departure? The departure was, so these recommendations about pressure are specific to a particular valve and installation. And Schlumberger recommended that these valves be operated at a specific pressure. And in fact, there were two things going on for Hess. One of them was it was consistently operating the valves at a pressure below what Schlumberger had recommended for these wells. And secondly, that it shut off the flow of oil through these valves an excessive number of times. And I take the word excessive from a Hess document. And that's a huge temperature change and it degrades the seals over time. And so does the pressure problem. And that's what the evidence showed. There isn't similar evidence of a departure from a recommended pressure for the other valves that Hess was operating for other manufacturers. That's simply a difference. It's a factual difference based on this record. And that's what the court considered. And again, this history of operation was not available to the Schlumberger investigators at the time of that 2016 analysis. Ms. Shaw, opposing counsel, led off with her textual argument focused on the word of in 6.3.2.2. And what do you make of that? So, first of all, I want to point out that that word of, it's a very short word, and it does not appear in the contract itself. It appears in industry standards. And it appears in a specific context. And Hess presented one expert who was not an API compliance expert. Schlumberger presented two API compliance experts. And Schlumberger's experts explained that in the industry, this provision that includes the word of encompasses drawing-to-drawing analysis and doesn't mean what Hess said. And to be clear, this is about this provision, 6.3.2.2, is a provision about design. So the theory you heard today and in Hess's briefs is that every single valve made since 2004 is nonconforming because the original drawing didn't match, in this very insignificant way, the original validated valve. And we presented evidence that showed that that wasn't the case. We presented evidence showing that there was actually no material difference between what we know about the validated valve in 2004 and the drawing that's remained consistent throughout this period. Would you go a little further with that statement? As I recall from the briefing, no doubt from Hess, that there never was a valve built consistent with the specifications and plans. So we're talking about this is really an issue of tolerances. So any time you have a drawing and you have an actual manufactured device, it's, as a matter of ordinary manufacturing, there's going to be a level of tolerance between the measurements in the manufactured physical item and the drawing itself. That's just a matter of engineering. And by the way, we presented evidence at trial that showed that there was no material difference between the validated valve, which, of course, nobody has that validated valve. The validated valve was spent through the validation process. So the conclusion that there was a difference between the validated valve and the drawing is based on reverse engineering and reconstruction and inferences drawn from things written in the validation package over time. But I do want to take a step back and say this theory that they're raising here is that every single valve made since 2004 is nonconforming. Well, now we're getting to the very large number of valves that are in operation, 137 valves in operation in the Gulf at the time of these failures. And the failure rate in that population was less than 5%. So for other operators and 100% for Hess. The evidence that you're talking about now, but also what I explained, it does seem to me that these valves, in a way, are expected to fail in a small percentage of the time. Something about the stresses of the operation, I suppose. So perfection, as expensive as it is when it's missing, isn't achieved with these valves. If you take out Hess's experience with Schlumberger valves, and I know it's in your brief, but make sure which number are we talking about. What percentage of the valves comparable to what was sold to Hess failed outside of Hess's operations? 5% or less. I'm not sure which one of those numbers fit my question, but it's the 5% number. Depending on how you look at it, it's either 5% or 3.9% or something like that. And there are situations where there are two pistons, each of which has a number of valves on it. And there are situations where one piston fails, but the other one continues, and that's why you have two pistons, so that there's redundancy. To be clear, these are safety valves. They are not the valves that you use to control the flow of production fluid through the well. These are safety valves that exist so that if there's a hurricane or some emergency happening, you can shut off production altogether. So when they fail, they fail closed. And that's what happened here. We're not talking about a situation where there's a leak or the valve wasn't operating. These aren't operating valves. These are valves that are safety valves designed to stop the flow of production fluid, and they did that here when they failed. The issue is that they had... Would you address the question? Excuse me. I know you have a lot to cover, and I want to move you into traceable components. Sort of explain your take on that. So there's two sets of evidence that has kind of conflates, and all of this is based on that 2016 report. There were aspects of the 26th report that said that there was a difference between what we think the validated valve looked like in 2004 and what the drawing looked like. So that's one set of issues. Then there was also some discussion in that analysis suggesting that there was a bad batch, that over time the tooling that was used to create these rosette springs degraded and changed a little bit in its shape so that the dimensions of the rosette spring, once it was compressed, varied a little bit from the original productions in the early 2000s. And that bad batch evidence relates to a kind of inspection problem. It's not a design problem. The design of the springs didn't change between 2004 and the production of these valves. Arguably, there was some minor change in what the pressed springs looked like based on something that happened at the producer of the springs, which was Green Tweed, not Schlumberger. So the question about that, quote, bad batch is really a quality control question. It's not a design question. There was no intentional change in the design. And the quality control provision in the API standards is 7.6 or 7.6.2, which imposes certain obligations on Schlumberger to do inspection. But remember, Schlumberger did not make these seals. It received from Green Tweed an already assembled seal. And to inspect that upon receipt, you'd have to disassemble it and really destroy it. Does 7.6.2 mean that if there's a traceable component, each one of those is to be tested? Or is it just a sampling matter? Your Honor, I'm not positive about that. But here, there's no— Part of the argument is you have to disassemble it if you're really talking about the spring has to be tested, and so you can't ever use the valve. Yeah. But I don't—I mean, if this is really saying if there's a traceable component and every one of the traceable components has to be tested, that's not like a rather sizable demand. So I'm just wondering how that was supposed to work. Well, and the—this quality control provision applies—doesn't apply to nonmetallic seals. And there's no—we know that these seals were nonmetallic. And they were classified as such by the parties in their contract, and that's consistent with industry understanding as well. So the seal, the assembled thing that Schlumberger received from Green Tweed, that was the traceable component from the perspective of Schlumberger. And, you know, taking a step back, these API standards, they're created in the industry. And they're created by a body that includes exploration companies like Hess as well as manufacturers like Schlumberger. And the whole point of them is to establish a set of understandings about who bears what risk and what they can rely on in terms of the components they receive and purchase. The whole point of those standards is to allocate risk and understanding in a sensible way. So companies like Hess control how the equipment is used over time, and they enjoy all the economic upside if the wells succeed. Manufacturers provide—can only control what they control. And here, that's why the traceable components provision is structured the way it is. From Schlumberger's perspective, the traceable component was the seal. Now, could Hess have sued Green Tweed? Maybe, if the thing had failed during the warranty period. It could have sued Green Tweed for some nonconformity. But from Schlumberger's perspective, the API compliance experts testified that what Schlumberger did complied with API manufacturing standards. And that's the alleged breach here. That's the alleged nonconformity. And again, Schlumberger presented two experts in API standards and API compliance. Hess had no expert that was qualified to talk about API compliance. And that by itself provides this court with no reason to—or ample reason to defer to the district court's findings on that issue. I do want to mention briefly the substantial change issue, and that's—basically, you can't revoke acceptance of a good after you have altered its composition and function. Or if the good is in an improperly maintained condition. This doesn't require proof, by the way, that the substantial change in the condition actually caused the failure. All we need to prevail on this basis is proof that there was a substantial change between when the valve was accepted by Hess and when it ultimately failed. And, by the way, the installation of this valve alone was enough to constitute a substantial change. It was—the spring was used to create a seal at the surface, and then the thing was installed—the valve was installed thousands of feet below the earth and functioned for 15 months before it failed. So that installation alone was enough to constitute a substantial change that made it impossible for Hess to revoke acceptance. But the district court went farther than that. The district court found that the seals had been scratched, that they were not in the same condition that they were in when Hess first received them. And that, by itself, precludes revocation whether or not there was proof that the scratches were what caused it to fail. So that's an independent basis to support the conclusion. In short, Your Honor, the district court here heard evidence about industry expectations. It heard expert evidence, and it relied on that evidence after weighing it after live testimony at trial. There's no basis to find that all three of the district court's factual conclusions were clearly erroneous. We ask the court to affirm. Thank you. All right, counsel. Thank you. Thank you, Your Honors. I'd like to briefly address some of the points that my colleague, Ms. Coberly, made. The first, an overarching issue. Ms. Coberly is correct that you could reverse based on findings that the district court was clearly erroneous on the three factors at issue here, but that's not required. You can also reverse putting aside the clearly erroneous findings, although I want to get to them in a second. You can reverse de novo just as a matter of law based on the arguments we've made in our briefs. Because if the district court made an error of law, which this court reviews de novo in interpreting the relevant contract standards, which we believe it did here, both with respect to 6322 and with respect to 762, and the district court committed an error of law in misapplying Texas law on causation and substantial change, that is enough for reversal here. You don't even need to get to the question of clear error. 6322, can a drawing be of something even if they aren't identical? Yes, Your Honor. And Ms. Coberly brought up the point of tolerances. And this is critical here, and I think it exemplifies the problem with the district court's interpretation. Yes, a drawing can be of something if it's not exactly minutely identical. And with the springs here, the engineers of the springs, when they create the drawings, account for this probability. And the engineers decide what is the required tolerance within which a spring can deviate in measurement and still function and still be said to be designed to the same standard. And that tolerance is in the original drawing. The original drawing lists a measurement and a tolerance for the bend in the rosette spring, which is what we're talking about here. And it is up to the engineers to determine what the appropriate tolerance is. And that's why the standard says of, because if a spring is manufactured within that tolerance, it's still a drawing of the spring. It's not up to third parties like the district court or otherwise to be imposing a subjective view of whether that difference was substantial or insubstantial. That's the key issue here. The district court recognized that there was a difference between the original spring and the original drawing. And the evidence showed that that difference was not insubstantial. It was outside the drawing's tolerance. The validated spring had a measurement in the rosette spring bend that was outside of the original drawing's tolerance. Now, the district court overlooked that and overlaid some insubstantiality, subjective determination that's not found in the standard and said that even though there was a difference here, the district court determined that difference to be insubstantial. And that is not the role of the district court when it comes to this standard. It's the role of the engineers who determine what the required tolerance is. And that's why the drawing needs to be of the validated spring. And that's why there is a substantiality requirement elsewhere when it's talking about the relationship between later drawings to new drawings. But there is not that requirement when it comes to drawings of the valve because the original drawings themselves build in the tolerance. And it's not up to a subjective determination later. And I do want to touch on this insubstantiality point. And we go over it in our briefs and I don't need to belabor it here. But I think it is notable and, again, exemplifies the difference in the legal interpretation. It exemplifies the problem in the legal interpretation. That the evidence that the district court cited to support this subjective insubstantiality finding didn't say that at all. It wasn't even about the relationship that we're talking about. The evidence that the district court cited was about the difference between the validated valve and the later valve. It had nothing to do with the original drawings. And, in fact, the report that the district court cited when it talked about the original drawings said that there were no original drawings of the valve. That's what that evidence said. It then said that the difference between the valve to later valve, there was a difference. And it called that difference significant, not insubstantial. So here is the problem. And that's a clear error issue. But, as I said, it exemplifies the problem with the legal interpretation. That there be a subjective judgment on insubstantiality when the standard doesn't provide for that. I want to turn briefly also to the issue of clear error. And I think it is plain here. Again, clear error is a high standard. And you don't need to reach it to reverse here because there were significant errors of law that affected the judgment. But this court, as I have said, has not hesitated to reverse for clear error on causation findings where the record indicates that there be a firm and definite conviction that a mistake was committed in the factual findings. And I think there's no other plausible inference here. Your honors are having trouble with the flip-flop between the hard evidence and Schlumberger's trial testimony. And you should have trouble with it. And if you don't want to look at what they say, you can look at what they did. Because your honor is correct that in real time they investigated this problem. They spent 13,000 man hours of time investigating. Yes, your honor. And what they did as a result was recall all the valves. And I think that there is no other conclusion to be drawn based on the overwhelming evidence in the record versus their uncorroborated say-so at trial that a mistake was committed in terms of the causation findings as a matter of clear error. Thank you, your honors. Excellent presentations from both sides. We still have to figure out what to do. We'll call the next case.